May it please the court, my name is Kaino Oswega. I'm an admitted student here under the supervision of Peter Afras-Tiabi and Catherine Davis, professors at Chattanooga University and the pro bono appointment counsel for the petitioner, Ms. Nora Noroyan. This court should reverse because the adverse credibility determination of the lower court was based on the cited inconsistencies which did not go to the heart of the asylum claim and for which plausible explanations were given and ignored without an articulated reason by the lower court. The first cited inconsistency that was used was this disagreement between a time that arrests occurred at a political rally that Ms. Noroyan attended. Now, the record makes clear that there's no actual inconsistency here. Ms. Noroyan testified that she was at this political rally where she saw police wading into crowds of protestors, beating them with sticks, taking them away and spraying them with water hoses and she reasonably believed that this activity was police making arrests and when confronted with the news report that said the arrests were made at a different time, she simply chose to believe her own two eyes rather than the official report. Where did the report come from that the asylum officer relied upon? I believe it was a news report. And the news report is issued by state controlled media, by some independent observer, it was an internet report, what kind of a report is it? I believe it was state controlled media. The U.S. state report acknowledges that the Armenian news is biased against political opposition parties. Is there any reason to doubt the veracity of the state report? Does anybody really care whether the arrests were made at 7 o'clock at night or 2 o'clock in the morning? Only the lower court. Really the arrests are a very minor detail in the overall story. What time did Mr. Royan leave the rally? She left early actually. She left before 2 a.m. She left in the early evening right after she witnessed the police activity occurring. She decided I'm going to leave and not get lumped into the group who were getting beaten by police. It was about 6 o'clock at night, wasn't it? Yes, it was about 6 or 7. And that's what she testified to, yes. And so again, this discrepancy is not really a discrepancy at all because Mr. Royan, it could be plausible that she saw this activity taking place and she saw that it was, she assumed the arrests were taking place and then she left and then later on actual official arrests occurred which were then reported by the news because we don't really know what the news is reporting on as arrests. It could be bookings or anything else. But we do know that Mr. Royan saw this activity taking place which she thought was arrests. Now also, the time of arrests are really not important when it comes to the total circumstances that, you know, she was at this rally. She saw this activity taking place. She was politically active and this rally was one rally of many which she spoke at other rallies. She didn't speak at this rally. And so it's really not a big part of her testimony. Well, what about her concussion testimony? Her concussion testimony is somewhat unclear whether or not she was actually confronted with it. She said in her testimony that she didn't tell the asylum officer. But then the questioning stops there. There was no confrontation that, you know, saying, yeah, you did tell the asylum officer or you didn't tell the asylum officer this. And she wasn't given an opportunity to explain, you know, this discrepancy which the lower to say, you know, to offer a plausible explanation. But when the government counsel cross-examined her, she made it very clear it was in 2003, did she not? I believe she said no, the concussion of 2000. She said that in 2000, sorry, the concussion was in 2003. But what the cross-examiner was referring to was the incident of May 2000. And that's where the discrepancy. She clarified it, did she not? Yes. She clarified that she suffered a concussion in May 2003, but not of May 2000. Mr. Osprecha, the – I think you've made some very good points that the issues, the three issues that are primarily involved in this matter are – the question is whether they go to the heart. But on the other hand, there was clear inconsistency in her testimony, was there not? I don't believe so. I mean, the – By that I mean, for example, the concussion, when that occurred, the fact that she didn't mention and so on and various things. That's what I'm talking about. I'm not saying they go to the heart of it, but there were inconsistencies in each of these three points, right? I would say that they weren't inconsistent in the sense that they were necessarily combative. The points were inconsistent in the sense they couldn't both be true. Would you agree with that? That she either had a concussion or she didn't? Well, I won't bother to go into the details, but there are three basic areas where there were inconsistencies in the record, and that was the basis of the IJ's finding. And I guess my concern is this. You seem to be indicating that, in effect, even though there is authority in our court, you know, on risk versus holder, for example, that if there are a lot of these things, that cumulatively we're supposed to rely upon the IJ. The IJ sees the alien, has a conversation, or hears the testimony, reads everything. We don't see that person. We read the cold record. Should we not be more relying upon what the IJ found and saw because of the cumulative number of these inconsistencies? I believe that the IJ, when making the determination on posture and presence of the witness, is supposed to say that that's what they're making the determination on. So you're saying that the IJ didn't articulate the reasons adequately to form a basis of substantial evidence. Exactly. They didn't. They, under an obligation from, I believe it's... Do you concede that, moving to a different issue, do you concede that the Catt claim was not exhausted? The Catt claim, I believe, was exhausted. And what exactly was said that exhausted that issue? She referred to Catt in the brief on appeal, but all she did is just said she was seeking relief under Convention Against Torture. She made no allegations, didn't ask for reversal, didn't say anything else. Is that sufficient under Wang v. Ashcroft to exhaust that claim? I'm sorry, I'm unfamiliar with Wang v. Ashcroft. It's not a very good case. Let me just put it this way. Her reference to Catt seemed to be merely a summary of the IJ's decision. Why was it more than that? Or is that sufficient? I believe it's sufficient. Yeah, I believe it's sufficient. I mean, she was obviously, if we accept her testimony as true, she was obviously persecuted by the state government and pretty much tortured by these police. They beat her mercilessly on multiple occasions. But she didn't say anything in her brief to the BIA. She has this one line where she says, I'm appealing from the IJ's denial of, and she lists three things, asylum withholding and Catt. This is sort of a standard procedure. After that, there is no reference whatsoever to the Catt. How is she exhausting that? That appears to be merely descriptive. I'm appealing from, but then she has no argument, nothing. There's not a word. I would say that the standards are pretty much the same. The argument is similar. Her argument then just flows from there. Yeah, it mirrors her argument for asylum or argument for withholding removal. It's one big argument. Counsel, you have a little less than a minute. Maybe we should save that for a rebuttal. I would, actually. Yes, thank you. We'll hear from the government. May it please this Court, my name is Andrew Oliveira. On behalf of the respondent, Eric Holder, the Attorney General of the United States. Noreen claimed that she was persecuted in Armenia on account of her political opinion. However, her testimony was inconsistent, and those inconsistencies went to the heart of her claim. Well, let me just interrupt right here since the time is short. I have a hard time seeing these as inconsistencies. For instance, she said she did not tell the asylum officer that she had suffered the concussion in 2000. And then she was cross-examined at the hearing, and she made it very clear that it occurred in 2003. Why isn't this just a clarification? Well, because she actually did tell the asylum officer that she suffered a concussion in 2000. Well, how do we know that? Page 101. Okay. And that's the hearing officer's transcript, is that right? That is the transcript of her interview. Okay. And how is that transcript prepared? It is paper-coded, and they handwrite it out, and they type it up. Okay. So this is handwritten by the officer, and then these are his notes typed up? Yes. We have no other independent verification. There's no electronic recording. But she was questioned about this, and she did have the opportunity to dispute the accounts. She had the opportunity to dispute which account? When she testified before the immigration judge, the asylum officer interview was brought up, and she did have the opportunity to. Right. And she said, no, I didn't tell him that. She said two things. Number one, I didn't tell him that I had suffered a concussion in 2000. And number two, I'm not relying on that. I'm not telling you today that I suffered a concussion in 2000. So what's the problem? Well, it wasn't just the concussion, however that was. Furthermore, she did say that she suffered an ear injury. When confronted with this inconsistency, she claimed that the doctor simply left it off because he didn't think it was relevant. However, she specifically testified to the asylum officer that her ear was hurting as a result of this beating in 2000. But when you get right down to this, I mean, the real issues in this case, at least as I'm understanding it, is her son's political activities in 2000 for which he did receive asylum. There were threats to her life in 2004, a serious beating in 2003 that left her hospitalized for a month, another beating in 2004 after she gave a political speech. And as Judge Bybee just mentioned, she didn't even make a point about the 2000 issue in her written application. It came up later. But I find it real difficult in understanding how the three inconsistencies that the government refers to go to the heart of the claim, given what I just said about these other major points where no inconsistency was found to the best of my knowledge. Well, first, the injuries in 2000. Again, she said that that was a direct result of her son giving her the documents. And the severity of the injuries is relevant to her claim because, again, the severity of the injuries is an essential element to the claim. What if she doesn't rely on those? As Judge Bybee pointed out, this was not her point. She made these other points. That's what she relied upon. It's a little bit like the government can come here and make an argument and say we're relying on these three things, and we start asking you questions about 5, 6, 7, 8, and 9. She bears the burden, but where she's carried the burden with respect to these more significant things, what role, if any, does that play in our analysis? Well, again, the credible testimony is the first element. And the immigration judge identified inconsistencies that went to the heart of her claim. Well, that's the problem, isn't it, whether it goes to the heart of the claim? I'm having difficulty seeing why any of these three points go to the heart of her claim. Okay. Well, again, the injuries specifically were resulting from the arrest. That's 2000. Yes. Not 2003, not 2004, not her son's activities for which he received asylum. Well, she said, though, that the injuries in 2000 were a result of her son giving her the documentation to Holtz. So it does go to the heart of her claim. With the omission of the beating by the individuals after the last rally she attended. Are you talking about the May 17th, 2004? Correct. Okay. And why isn't the BIA just flat wrong on this one? The BIA says there is no mention of this important incident in the Respondent's written application. That is flat wrong. Well, she mentions that she was beaten after the May 17th, 2004. She's mentioned the date. She mentions the men. She mentions everything except for one little thing. But that one little thing, as you say, is actually. It's not even clear that that's what the BIA is relying on, is it? But that's essential to her claim because the claim is that she was beaten because she had the documentation regarding the prison death. The BIA, you haven't answered my question, counsel. The BIA didn't say it was because she omitted that one little thing, did it? No, it said that because she omitted the event. It says there is no mention of this important incident. Now, an incident is, to me, says, in just ordinary common conversation, says that she's talking about the incident on May 17th, 2004. But if that's what the BIA is saying, it's flat wrong, isn't it? Well, I don't read it that way. What they're talking about is how she claims that she was. In her testimony, she claims she was beaten and she recognized one of the individuals. The fact that she, the recognizing of one of the individuals is essential to her claim because it. Why? Because it. Why does it make any difference if she could identify one of the individuals? Because then. She said that three people, three youngsters attacked her. Right. What difference does it make who they were? Because it goes to whether or not it was on account of a protected ground. Because of the government involvement or government support of the, what was happening? Well, that it was, because she recognized one of the individuals, it would. She thought she recognized one of the individuals. She wasn't sure, was she? No, she said she recognized him from the prison. But it goes to saying that it was on account of the fact that she was holding these documents for her son and that she had submitted them to the prosecutor's office. Without any evidence as to the motive of the beating, it can, it could simply be a random street crime. By saying she recognized one of the assailants, it gives a motive behind the incident. I'm a little troubled by the fact. It seems to me that the government here is trying to rewrite the BIA's decision in its appeal. As you know, under Lopez Reyes, you cannot take an applicant's testimony and say that it's per se lacking in credibility because it includes details that are not set forth in an asylum application. It seems to me that's what you're doing here. No, I don't think that's what we're doing. I mean, this Court has said that leaving out, omitting essential elements is a basis for that. Ultimately, that's what it boils down to, isn't it, whether these are essential elements? Yes, and we believe they are. And your view is that we are far better, or rather the IJ is the one that should decide that rather than the three of us. That is correct. The immigration judge sits there, evaluates the entire testimony, and has a better feeling for when an inconsistency is based off an alien simply being nervous or trying to remember details. But the IJ does have to follow our law. Doesn't the IJ have to do that? That is correct. What I'm troubled about, it seems to me that if you take each of these categories, there's at least one case in each category where the IJ didn't follow our law. Do you agree with that? But there's also a case law that supports what the immigration judge did. So if you have inconsistent case law, what happens? Well, in that case, you wrote – Not that the Ninth Circuit would ever do anything inconsistent. I would just note that this Court has repeatedly held that there is extreme deference to the factual findings of the agency. The fact that there can be inconsistent conclusions draw does not compel reversal of the agency's decision. I mean, ultimately, that is the issue. Does the evidence in the record compel reversal? And based on this record, it does not. If there are no further questions, we can see the remainder of our time and request that this Court deny the petition for review.  Thank you, Mr. Oliveira. Mr. Sueika. I would like to address the points that were made. First off, the recognized assailant issue, that is not random street crime. It's pretty clear from the record. Not from her statement, not from her asylum petition, is it? Oh, from her asylum petition? Actually, yes. She had mentioned that she was receiving threatening phone calls, that she had – Not with respect to the May 17, 2004 beating by the three young men. No, no, no. Before that, yes. And this was a pretty constant occurrence that she was receiving threatening phone calls throughout her life. But the possibility remains, as the government suggests, that this could have been a random street crime. It could have been, but it's highly unlikely because she was not robbed and the attackers mentioned that they were going to kill her and they were only stopped when other people stopped them. Now, if she was going to be robbed, they would have stopped her as they incapacitated her. She's, you know, an elderly woman and she would be lying on the ground. It would be very easy for them to take – But the fact that she thought that she recognized one from her previous detention really is an important fact that she certainly might have been useful to have mentioned in her asylum declaration, wouldn't it? Yes, it would have been useful, but it was not necessary and the facts by themselves still suggest that it wasn't a random street crime. And I see I'm actually over time, so thank you very much. Okay. Nice job, Mr. Oswego. For a law student, you did fine. I know it's a hard thing to do, but you did a very nice job. Congratulations. Thank you very much. We thank both counsel for the argument. And we thank Chapman University for participating in our program. The next case on the calendar is Cruz Carbajal.
judges: Nelson D. W., Bybee, Smith M.